# Order

Michigan Supreme Court
Lansing, Michigan

July 29, 2021

163084-5

HORACE SHEFFIELD, III, and RODRICK HARBIN,
      Plaintiffs-Appellees,

v

DETROIT CITY CLERK and DETROIT ELECTION COMMISSION,
      Defendants,
and

DETROIT CHARTER REVISION COMMISSION,
      Intervening Defendant-
      Appellant.

_____/

ALLEN A. LEWIS and INGRID D. WHITE,
      Plaintiffs-Appellees,

v

DETROIT CITY CLERK and DETROIT ELECTION COMMISSION,
      Defendants,
and

DETROIT CHARTER REVISION COMMISSION,
      Intervening Defendant-
      Appellant.

_____/

Bridget M. McCormack,
Chief Justice

Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch,
Justices

SC: 163084
COA: 357298
Wayne CC: 21-006043-AW

SC: 163085
COA: 357299
Wayne CC: 21-006040-AW

On July 7, 2021, the Court heard oral argument on the application for leave to appeal the June 3, 2021 judgment of the Court of Appeals. On order of the Court, the application is again considered. MCR 7.305(H)(1). In lieu of granting leave to appeal, we REVERSE the judgment of the Court of Appeals and the Wayne Circuit Court's May 26, 2021 opinion and order granting mandamus relief, and we REMAND this case to the circuit court for further proceedings not inconsistent with this order.

In this matter, we are asked to decide whether the Detroit Charter Revision Commission may submit a proposed revised charter to voters notwithstanding the fact

that the Governor has not signed or given her approval to the proposed revised charter. At issue is MCL 117.22, which says:

> Every amendment to a city charter whether passed pursuant to the provisions of this act or heretofore granted or passed by the state legislature for the government of such city, before its submission to the electors, and every charter before the final adjournment of the commission, shall be transmitted to the governor of the state. If he shall approve it, he shall sign it; if not, he shall return the charter to the commission and the amendment to the legislative body of the city, with his objections thereto, which shall be spread at large on the journal of the body receiving them, and if it be an amendment proposed by the legislative body, such body shall re-consider it, and if 2/3 of the members-elect agree to pass it, it shall be submitted to the electors. If it be an amendment proposed by initiatory petition, it shall be submitted to the electors notwithstanding such objections.

The statute is clear that both charter amendments and charter revisions must be "transmitted to the governor of the state." Charter amendments must be transmitted before submission to the electors, while charter revisions must be transmitted before final adjournment of the commission. After review, the Governor shall sign the amendment or revision if she approves it. The statute also differentiates between amendments proposed by a legislative body and amendments proposed by initiatory petition. The statute is clear about what happens next for both types of charter amendments if the Governor objects to and returns them. For amendments proposed by a legislative body, "such body shall re-consider it, and if 2/3 of the members-elect agree to pass it, it shall be submitted to the electors." MCL 117.22. For amendments proposed by initiatory petition, "it shall be submitted to the electors notwithstanding such objections."[1] MCL 117.22. The statute does not address the situation where, as in the instant case, a charter revision is returned without the Governor's approval.[2]

Plaintiffs would have us read the statute's current silence with regard to charter revisions as vesting the Governor with an unfettered and irreversible veto over the work of a charter commission that would deprive the electorate of a city of any opportunity to

---

[1] See also Const 1963, art 2, § 9 ("No law initiated or adopted by the people shall be subject to the veto power of the governor . . . .").

[2] An earlier version of the statute stated that, following the objection and return by the Governor, a charter revision could still be submitted to the electors upon a two-thirds agreement by the charter commission. See 1909 PA 279, § 22. This language was removed when the statute was amended in 1913 to read as it does now. 1913 PA 5, § 22. Although it is clear that the two-thirds override no longer applies to charter revisions, the statute is now silent as to what happens after a charter revision is objected to and returned and whether the Governor's approval is required prior to submission to the electors.

vote on a revised charter unless and until the Governor gives her approval. Pursuant to Article 7, § 22 of the 1963 Constitution, "[u]nder general laws the *electors* of each city and village shall have the power and authority to frame, adopt and amend its charter . . . ." (Emphasis added.) Article 7, § 22 describes itself as a "general grant of authority" that "[n]o enumeration of powers granted to cities and villages in this constitution shall limit or restrict . . . ." Article 7, § 34 further directs that "[t]he provisions of this constitution and law concerning counties, townships, cities and villages shall be *liberally construed in their favor*." (Emphasis added.) Based on these provisions, we have previously held that "it is clear that home rule cities enjoy not only those powers specifically granted, but they may also exercise all powers not expressly denied." *Detroit v Walker*, 445 Mich 682, 690 (1994).

Reading MCL 117.22 in isolation, plaintiffs' position may not seem unreasonable. But we must read MCL 117.22 against the backdrop of Article 7, §§ 22 and 34 of the 1963 Constitution and subsequent developments in our caselaw since their adoption. Under Article 7, § 22, the electors of cities are vested with control over their cities' charters, and Article 7, § 34 states that statutory and constitutional provisions concerning cities should be liberally construed in their favor. When read together, these constitutional provisions lead us to conclude that, in the face of the statute's silence as to the legal effect of the Governor's objection to a proposed charter revision, we cannot interpret such silence as requiring gubernatorial approval before a charter revision is submitted to the electors or as granting the Governor a veto power that cannot be overridden. We decline to read into MCL 117.22 a requirement that is not explicitly spelled out, bearing in mind that cities continue to enjoy "powers not expressly denied," *Walker*, 445 Mich at 690, and the electorate of a city is entitled to the final word as to whether a revised charter is to be adopted, Const 1963, art 7, § 22. Because MCL 117.22 does not explicitly provide the Governor with an unfettered veto in the charter revision process, we decline to create one from the statute's silence.

Because the circuit court did not address other issues raised by the parties in light of its ruling on the count for mandamus, we REMAND this case to that court for any further necessary proceedings not inconsistent with this order.

WELCH, J. (*concurring*).

I concur with the majority's order allowing the Detroit Charter Revision Commission (DCRC) to submit the proposed revised charter to the voters of the city of Detroit. The principal task before the Court is to determine whether MCL 117.22 precludes a proposed revised charter from being submitted to the electors without the approval and signature of the Governor. While I appreciate Justice VIVIANO's thorough analysis, I disagree with his view that the only reasonable reading of MCL 117.22 prevents such a revised charter from being submitted to the electors under these circumstances and that Const 1963, art 7, §§ 22 and 34 have no role in this case. I write separately to explain why I believe that the Court's refusal to interpret silence in the statute as granting the Governor a one-of-a-kind, unfettered veto power that cannot be

overridden under any circumstance if she returns a proposed revised charter without her approval is consistent with our constitutional obligations, precedent from this Court, and core principles of democratic governance.

## I. FACTS AND PROCEDURAL HISTORY

In the August 2018 primary election, Detroit residents voted yes on a proposal to begin a general revision to the Detroit City Charter.[3] The members of the DCRC were then elected in the November 2018 general election, and the DCRC was tasked with drafting a proposed revised charter. Under MCL 117.18, the DCRC had no more than three years to accomplish this task and obtain approval of the revised charter from Detroit residents. The DCRC asserts that it has held over 400 formal and informal meetings, reviewed approximately 315 proposed revisions, considered more than 200 public comments relating to a preliminary draft, engaged with community leaders and a variety of interest groups, and spent hundreds of hours and more than $700,000 of taxpayer money in its efforts to create a comprehensive revised city charter.

The DCRC, pursuant to MCL 117.22, submitted its proposed revised charter to Governor Whitmer on March 5, 2021, and requested expedited review. On April 30, 2021, the Governor returned the proposed revised charter without her signature, and instead provided comments and objections in the form of a legal memorandum prepared by the Attorney General. The Governor identified what she viewed as "substantial and extensive legal deficiencies," the substance of which the DCRC contests.

For ballot certification purposes, the DCRC dubbed the charter revision question "Proposal P." The DCRC adopted a resolution to submit Proposal P—which reads, "Shall the City of Detroit Home Rule Charter proposed by the Detroit Charter Revision Commission be adopted?"—to the Detroit City Clerk on May 6, 2021. On May 11, 2021, the Detroit Election Commission voted 2-1 to place the proposal on the ballot.

The DCRC transmitted what was apparently intended to be a new draft of the proposed revised charter to the Governor on May 13, 2021. The Governor declined to review the new draft, stating that the May 11, 2021 deadline for submitting ballot wording to the Detroit City Clerk under MCL 168.646a(2) had passed. The DCRC has since abandoned the May 13, 2021 draft and has conceded that the only revised charter that will be considered by voters is the one that was previously submitted to the Governor on March 5, 2021.

---

[3] The question of whether to revise the city charter was proposed in accordance with Detroit Charter, § 9-403, which requires the question to be presented to the electorate of Detroit "at the gubernatorial primary of 2018, and at every fourth (4th) gubernatorial primary thereafter and may be submitted at other times in the manner provided by law."

The plaintiffs include groups of Detroit residents who filed two separate lawsuits against the Detroit City Clerk and Detroit Election Commission (hereinafter "defendants") seeking a writ of mandamus, among other relief. The Wayne Circuit Court consolidated the cases and allowed the DCRC to intervene. Following briefing and a hearing, the circuit court granted plaintiffs' requested mandamus relief and ordered defendants to remove Proposal P from the August ballot, holding, among other things, that MCL 117.22 requires a city charter revision to be approved by the Governor before it can be placed on the ballot.

The DCRC appealed in the Court of Appeals and filed a bypass application in this Court. This Court granted the DCRC's motion for a stay, denied the bypass application, and directed the Court of Appeals to expedite consideration of the claim of appeal. *Sheffield v Detroit City Clerk*, ___ Mich ___; 959 NW2d 518 (2021). The Court of Appeals affirmed the circuit in a split decision. *Sheffield v Detroit City Clerk*, ___ Mich App ___ (2021) (Docket Nos. 357298 and 357299). Among other things, the majority "reject[ed] the DCRC's argument that the Michigan Constitution grants it the power to submit a proposed charter revision to the voters regardless of statutory restrictions." *Id*. at ___; slip op at 5. The Court of Appeals majority held that under MCL 117.22, a revised charter cannot be presented to city residents for a vote without the Governor's approval. *Id*. at ___; slip op at 5-7. Judge FORT HOOD dissented. While she acknowledged that the charter revision process is subject to the general laws of the state, because MCL 117.22 did not explicitly require approval from the Governor as a prerequisite to voters having the opportunity to vote on a charter revision or otherwise provide a procedure to be followed after the Governor objects, Judge FORT HOOD believed that silence in the statute could not be construed as providing for a gubernatorial veto. *Id*. at ___ (FORT HOOD, J., dissenting); slip op at 2-3.

The DCRC then sought leave to appeal in this Court and requested another stay, which was granted. *Sheffield v Detroit City Clerk*, ___ Mich ___; 959 NW2d 531 (2021).[4] The Court then ordered oral argument on the application to consider "(1) whether a proposed revision of a city charter can be submitted to the voters without the Governor's approval of the revision, see MCL 117.22; and (2) the relevance, if any, of the amendment history of MCL 117.22, see, in particular, 1909 PA 279 and 1913 PA 5." *Sheffield v Detroit City Clerk*, ___ Mich ___; 960 NW2d 534 (2021).

## II. GUIDING LEGAL PRINCIPLES

These appeals come to the Court following the grant of a writ of mandamus. While the decision to grant such a writ is reviewed for abuse of discretion, we review underlying questions of law de novo. *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 59 (2018). The typical interpretive principles apply.

---

[4] We later denied plaintiffs' motion for reconsideration of the order granting the stay. *Sheffield v Detroit City Clerk*, ___ Mich ___; 960 NW2d 122 (2021).

We must consider "both the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme," *Speicher v Columbia Twp Bd of Trustees*, 497 Mich 125, 133-134 (2014) (quotation marks and citation omitted), and the language "must be assigned such meanings as are in harmony with the whole of the statute, construed in light of history and common sense," *Honigman Miller Schwartz & Cohn LLP v Detroit*, 505 Mich 284, 295 (2020) (quotation marks and citation omitted). The Home Rule City Act (HRCA), MCL 117.1 *et seq.*, is a law concerning the incorporation and governance of cities. Our Constitution requires that the "constitution and law concerning . . . cities . . . shall be liberally construed in their favor." Const 1963, art 7, § 34.

## III. ANALYSIS

The key question before the Court is what happens when the Governor does not give her approval to a proposed revised charter—may the revised charter be submitted to the voters without approval, or is such approval a prerequisite to the electorate's right to vote on the proposal? While Justice VIVIANO offers one way to read MCL 117.22, I believe there are several reasons why the majority's reading of the statute reaches the correct result.

## A. THE ORIGIN OF HOME RULE IN MICHIGAN

Home rule control for municipal governments in Michigan has its origins in the 1908 state Constitution. Not only did the constitution direct the Legislature to "provide by a general law for the incorporation of cities," Const 1908, art 8, § 20, it also provided that "[u]nder such general laws, the electors of each City and village shall have power and authority to frame, adopt and amend its charter," Const 1908, art 8, § 21. When embarking on this new path for local governance, the framers noted that "[t]he transfer of the powers of legislation from the state legislature to the people of the municipalities or their representatives necessitated the imposition of certain checks and prohibitions designed to secure conservative action on the part of those to become responsible for the future conduct of such affairs." See 2 Journal of the Constitutional Convention 1907–1908, p 1571. Shortly after the adoption of the 1908 state Constitution, we recognized that "[t]he new system is *one of general grant of rights and powers, subject only to certain enumerated restrictions*, instead of the former method of only granting enumerated rights and powers definitely specified." *Gallup v Saginaw*, 170 Mich 195, 200 (1912) (emphasis added).

The HRCA was the general law adopted by the Legislature in the next legislative session to implement these and other new constitutional provisions relating to local governance. See 1909 PA 279. Both then and now, this implementing legislation set the floor for what must be included in a city's charter at a minimum. The HRCA also imposed limitations, the principal of which was that charter provisions cannot "conflict with or contravene the provisions of any general law of the state." MCL 117.36. The

HRCA also contains procedures governing the process of proposing, revising, or amending a city charter. See MCL 117.18 to 117.25.

The experiment with home rule was apparently deemed a success, because home rule authority was maintained in the next state Constitution. Article 7, § 22 of the Michigan Constitution of 1963 provides:

> *Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village.* Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section. [Const 1963, art 7, § 22 (emphasis added).]

The current Constitution further dictates the lens through which laws concerning municipalities must be viewed:

> *The provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor.* Powers granted to counties and townships by this constitution and by law shall include those fairly implied and not prohibited by this constitution. [Const 1963, art 7, § 34 (emphasis added).]

## B. AMENDMENT HISTORY AND INTERPRETATION OF MCL 117.22

The Court has been called upon to determine the meaning of § 22 of the HRCA as currently codified at MCL 117.22. This is one of the provisions concerning the amendment and revision of a city charter.[5] In its original form, first enacted in 1909, § 22 provided:

> Every amendment to a charter before its submission to the electors, and *every charter before the final adjournment of the commission, shall be transmitted to the Governor of the State. If he shall approve it, he shall sign it; if not, he shall return the charter to the commission* and the amendment to the legislative body of the city with his objections thereto, which shall be spread at large on the journal of the body receiving them, *and it shall*

---

[5] It is undisputed that the HRCA distinguishes between revisions to a city charter and amendments of the same. See MCL 117.18; MCL 117.21; MCL 117.25; *Kelly v Laing*, 259 Mich 212, 217 (1932) ("Basically, revision suggests fundamental change, while amendment is a correction of detail.").

*reconsider it.  On such reconsideration if two-thirds of the members-elect agree to pass it, it shall be submitted to the electors.*  [1909 PA 279, § 22 (emphasis added).]

Section 22 of the HRCA has only been amended once, in 1913, and in its current form, it states the following:

> Every amendment to a city charter whether passed pursuant to the provisions of this act or heretofore granted or passed by the state legislature for the government of such city, before its submission to the electors, *and every charter before the final adjournment of the commission, shall be transmitted to the governor of the state.  If he shall approve it, he shall sign it; if not, he shall return the charter to the commission* and the amendment to the legislative body of the city, with his objections thereto, which shall be spread at large on the journal of the body receiving them, and if it be an amendment proposed by the legislative body, such body shall re-consider it, and if 2/3 of the members-elect agree to pass it, it shall be submitted to the electors.  If it be an amendment proposed by initiatory petition, it shall be submitted to the electors notwithstanding such objections.  [MCL 117.22, as amended by 1913 PA 5 (emphasis added).]

Under either version, a proposed amended charter or proposed new or revised charter must be transmitted to the Governor.[6]  Both versions provide that an *amendment* must be transmitted "before its submission to the electors," while *new or revised charters* must be transmitted "before the final adjournment of the commission."  Under either version, if the Governor approves and signs an amendment or revision, assuming all other requirements have been met, then the revision or amendment is put to a vote for adoption by the electors of a city.  The 1913 amendments made several changes with regard to what happens after the Governor withholds approval.

The HRCA has generally contained a mechanism to override a Governor's disagreement with proposed charter changes.  The 1909 version of § 22 stated that if the Governor objected to a proposed amendment or revision, then the relevant body "shall reconsider it," and if upon reconsideration two-thirds of the relevant body agreed, the proposal would be submitted to the electorate.  1909 PA 279, § 22.  Currently, under MCL 117.22, the procedure after gubernatorial rejection of amendments proposed by a city's legislative body is essentially the same—the "body shall re-consider it" and two-thirds of the members can agree to submit the amendment to the electorate notwithstanding the Governor's objection.  New language was added in 1913 to ensure that charter amendments proposed by an initiatory petition are submitted to the electors

---

[6] The HRCA refers to "every charter," which is presumably a recognition that a charter commission may be tasked with making revisions to an existing charter or, in the case of a newly incorporated city, drafting the first charter for the city.

regardless of the Governor's actions, which of course was consistent with Const 1908, art 5, § 1 and is still consistent with Const 1963, art 2, § 9.

Contrary to the 1909 version, MCL 117.22 is now silent as to proposed charter revisions that are not approved by the Governor. The statute *no longer requires a charter commission to "reconsider" the proposal after it is returned* with objections, and the statute contains no procedure or process whereby a charter commission would otherwise address the objections. No such procedure is contained elsewhere in the HRCA, although there are procedures for a charter commission to follow after the electorate rejects a proposed revised charter. See MCL 117.18 ("If the proposed revised charter is rejected by the electors of the city, the charter revision commission shall immediately reconvene and determine whether to take no further action, in which case it shall terminate and cease to exist, or whether to provide a revision of, or amendments to, the revised charter previously prepared by the commission.").

While I agree with Justice VIVIANO that changes in statutory language are presumed to reflect an intent to change or clarify the meaning of a statute, *Bush v Shabahang*, 484 Mich 156, 167 (2009), I disagree with his view of the legal effect of the 1913 amendment of MCL 117.22. When the Governor approves and signs a proposed charter amendment or revision, it is undisputed that the proposal is presented to the electorate. When the Governor does not approve the charter, it is the Governor's objection and postobjection procedures contained in MCL 117.22 (or lack thereof) that are at issue. Thus, the word "approve" does not have a variable meaning. Without an explicit legal obligation in MCL 117.22 to reconsider a proposed charter revision after its return with the Governor's objection, the Governor's views are rendered effectively advisory.[7] Conversely, objections to a charter amendment proposed by the legislative body of a city must be reconsidered by that body before further progress can occur under MCL 117.22, which creates a legal effect comparable to a veto, as Justice VIVIANO has observed. This Court generally "will not read words into a statute." *Byker v Mannes*, 465 Mich 637, 647 (2002). In order to construe MCL 117.22 as preventing electors from

---

[7] While their views are not binding, neither the Governor nor the Attorney General has claimed that gubernatorial approval is a prerequisite to presenting Proposal P to Detroit voters. A handbook for charter commissions created by a committee of the Michigan Association of Municipal Attorneys in cooperation with the Michigan Municipal League has previously framed the Governor's role as one of making recommendations: "A proposed revised charter is submitted to the governor for approval. The attorney general reviews it and advises the governor regarding its legality. The governor signs the charter if approved; otherwise the charter is returned to the charter commission with commentary of recommended corrections." Matson, *Charter Revision and Amendment for Home Rule Cities and Villages*, p 6 (contained within Michigan Municipal League, *Handbook for Charter Commissioners: Resource Materials for City Charter Revision* (1991), available at <https://www.mml.org/pdf/charter_revision/charter_handbook.pdf> [https://perma.cc/SA9C-AH2R]).

voting on a charter revision that lacks the Governor's approval, we would need to read additional language into the statute. As amici curiae in this case note, there remains a practical and likely political value to consultation with the chief executive, but the current text of MCL 117.22 does not make the Governor's approval a prerequisite to presenting a revised charter to the voters.

By looking to the 1908 Michigan Constitution, Justice VIVIANO concludes that the lack of gubernatorial approval has the effect of a veto. His view is not wholly unreasonable. The constitutional language describing the Governor's veto power with respect to the Legislature provides:

> Every bill passed by the legislature shall be presented to the governor *before it becomes a law. If he approve, he shall sign it; if not, he shall return it with his objections to the house in which it originated, which shall enter the objections at large upon its journal and reconsider it.* On such reconsideration, if 2/3 of the members elected agree to pass the bill, it shall be sent with the objections to the other house, by which it shall be reconsidered. If approved by 2/3 of the members elected to that house, it shall become a law. [Const 1908, art 5, § 36, as amended (emphasis added).]

While the language in the 1908 state Constitution is very similar to MCL 117.22, there are at least two important distinctions. First, the constitutional veto override language cited by Justice VIVIANO requires the Legislature to reconsider legislation after it is returned with objections and provides a clear procedure for what happens upon reconsideration and the pathway for a bill to become law. The requirement for reconsideration and the clear process that follows makes clear that the proposed legislation cannot become law until it is reconsidered and specified action is taken by the Legislature. Not only is a reconsideration requirement absent from MCL 117.22 as it relates to charter revisions, but there also is no procedure written into the statute for what a charter commission is to do next, nor is there any express language stating that the governor's objections strip the electorate of its right to vote on the proposal.[8]

---

[8] Justice VIVIANO opines that a commission's only option is "to consider the Governor's objections and submit an amended proposed charter to the Governor if it so chooses." This may be one inference that can be drawn from MCL 117.22, but even this is reading language into the statute given its silence with regard to process if the Governor objects to a charter revision. While Justice VIVIANO reads into the statute that the charter must be resubmitted to the Governor, there is an alternative explanation for the silence that aligns with our state's clearly articulated plan to provide autonomy to localities. The dissent further suggests that the majority's position renders the override provision for charter amendments proposed by initiatory petition needless surplusage. But Justice VIVIANO also acknowledges that our state Constitution has long prohibited the Governor from having the power to veto laws proposed and adopted by the people through petitions. See Const 1908, art 5, § 1, as amended ("No act initiated or adopted by the

Second, under the 1908 and current state Constitutions, legislation cannot become law without the Governor's signature or a veto override by the Legislature. Under the HRCA, however, it is the vote of a city's electorate—not the Governor's signature—that ultimately implements a proposed change to a city charter.

## C. THE HOME RULE STATUTES FOR VILLAGES AND COUNTIES USE DIFFERENT LANGUAGE TO ESTABLISH DIFFERENT PROCEDURES

The home rule statutes governing villages and counties demonstrate that the Legislature knows how to specify the procedures that must be followed when a Governor objects to a proposed change to a local charter. As noted by Justice VIVIANO, if "the Legislature uses different words, the words are generally intended to connote different meanings." *2 Crooked Creek, LLC v Cass Co Treasurer*, ___ Mich ___, ___ n 23 (2021) (Docket No. 159856); slip op at 9 n 23 (cleaned up). The statutes governing villages and counties obviously use different language than the HRCA. Contrary to the dissent, I read the difference in language used for village and county charter revisions versus that used for city charter revisions (under the HRCA) as cutting against implying an absolute gubernatorial veto power into MCL 117.22. The HRCA's lack of a clear requirement for reconsideration and lack of a postobjection procedure support this interpretation.

For villages, the process for amended and revised charters mirrors what the HRCA required before 1913. Following the objection of the Governor, the relevant body "*shall reconsider it. On such reconsideration*, if 2/3 of the members agree to pass it, it shall be submitted to the voters." MCL 78.18 (emphasis added). Unlike MCL 117.22, the text of MCL 78.18 imposes a clear statutory obligation to reconsider a proposed charter revision or amendment following the Governor's objection, and there is a clear requirement that the objections be overridden by a two-thirds vote before the proposal is submitted to the electorate. This is the same procedure and language that was required by the HRCA when it was enacted in 1909, but it is not the same language and procedure that is now in MCL 117.22.

The Legislature has enacted more detailed and onerous procedures for counties. After the Governor returns a proposed charter with revisions, "the commission shall reconvene, consider the reasons for rejection, revise the proposed charter and submit the

---

people, shall be subject to the veto power of the governor . . . ."); Const 1963, art 2, § 9 ("No law initiated or adopted by the people shall be subject to the veto power of the governor . . . ."). The last sentence of MCL 117.22 makes clear that initiatory petition charter amendments, which are suggestions to amend a law of a city proposed by the people of the city, will ultimately be submitted to the electors regardless of the Governor's approval or objection. Contrary to the lower court's construction of the statute, this suggests that the Legislature did not consider advisory consultation with the state's chief executive to be a "useless gesture."

revised charter to the governor within a period of 45 days." MCL 45.516. If the Governor objects again, then "the commission, within 30 days, either shall reconvene and revise the charter to comply with the governor's objections *or* it shall take all steps necessary to obtain a judicial interpretation to determine whether the charter conforms to the provisions of the constitution and statutes of this state." *Id*. (emphasis added). If the Governor approves the charter or a court renders a favorable ruling, the charter is prepared for "submission . . . to the electorate for its adoption." *Id*. The detailed and clear procedure provided for proposed changes to a county's governing documents demonstrate that the Legislature knows how to make it clear when approval from the Governor or the judiciary is a necessary prerequisite to the people voting on a proposed change.

### D. MCL 117.22 THROUGH THE LENS OF ARTICLE 7, § 34

As already stated, Article 7, § 34 of the state Constitution provides the lens through which to view all laws concerning cities, including matters of local city governance. Moreover, if serious doubts are raised about the validity of a statute, it is a cornerstone of our jurisprudence that the Court should seek to settle on a reasonable reading of the statute that does not conflict with the Constitution. See *People v Skinner*, 502 Mich 89, 110-111 (2018); *In re Sanders*, 495 Mich 394, 404 (2014); *Workman v Detroit Auto Inter-Ins Exch*, 404 Mich 477, 508 (1979). The dissent acknowledges this principle, but argues that Const 1963, art 7, §§ 22 and 34 are both inapplicable to these cases and that the majority's interpretation is not "fairly possible."

I do not believe the 1963 Michigan Constitution is as narrow as the dissent suggests or that it has no role to play. It is undisputed that Article 7, § 22 grants "the electors of each city . . . the power and authority to frame, adopt and amend its charter" subject to the "general laws" and that MCL 117.22 is a part of the general laws that implement that part of the Constitution. Certainly a general law cannot essentially eliminate the specific constitutional grant of authority to the people to adopt a charter. Moreover, a city is composed of the people who make up its electorate, and the formation and filling of a charter commission is a matter voted upon by the electors of a city. See MCL 117.18. "All political power is inherent in the people. Government is instituted for their equal benefit, security and protection." Const 1963, art 1, § 1.

I also believe it is clear that Article 7, § 34 provides the lens through which the present dispute must be viewed. Article 7, § 34 applies to all parts of the "constitution and law *concerning* . . . cities," and the HRCA is a law that inherently concerns and governs numerous aspects of the governance and organization of cities, including how to make changes to the governing documents of a city. (Emphasis added). The Address to the People regarding this provision further explains:

> This is a new section intended *to direct the courts to give a liberal or broad construction to statutes and constitutional provisions concerning all local governments.* Home rule cities and villages already enjoy a broad

construction of their powers and it is the intention here to extend to counties and townships within the powers granted to them equivalent latitude in the interpretation of the constitution and statutes. [2 Official Record, Constitutional Convention 1961, p 3395 (emphasis added).]

We have previously construed Articles 7, §§ 22 and 34 as stating that "it is clear that home rule cities enjoy not only those powers specifically granted, but they may also exercise all powers not expressly denied." *Detroit v Walker*, 445 Mich 682, 690 (1994). See also *Wilson v Highland Park City Council*, 284 Mich 96, 99-100 (1938) ("While the [HRCA] is rather comprehensive in its provisions as to what a city may or may not incorporate in its charter, it leaves many things to be implied from the power conferred."). "Our municipal governance system has matured to one of general grant of rights and powers, subject only to certain enumerated restrictions instead of the earlier method of granting enumerated rights and powers definitely specified." *Walker*, 445 Mich at 690. Section 22 of the HRCA does not expressly and clearly provide that the Governor's lack of approval prevents a proposed revised charter from being presented to the electorate, and this Court should not read such a requirement into the statute.

While I agree with the dissent that the DCRC is not a "city," one would be hard-pressed to conclude that a charter commission is not a *quasi*-legislative body of the city charged with drafting a new proposed city charter—i.e. the constitution of a city—to be voted on by the city's residents. Accordingly, a liberal construction principle should be applied to our reading of the HRCA under Article 7, § 34. The HRCA allows a city charter to define the process by which a charter revision commission is convened and also provides a default rule requiring a three-fifths vote in favor of "declar[ing] for a general revision of the charter" or an initiatory petition. MCL 117.18. In either event, the electors of a city decide whether to start the charter revision process, and if they do then the electors of a city elect the members of the commission. *Id*. The expenses of a charter revision commission are to be allocated by the legislative body of a city and paid from the city's budget, MCL 117.17 and 117.19, and at a practical level, a charter revision commission is required to operate in a manner analogous to the legislative body of the city, see MCL 117.20. While the DCRC is not a true legislative body, it is a legally authorized body of the city of Detroit that is created by statute, funded by the city, and required to follow many of the same procedures as the true legislative body of the city.[9] *Eikhoff v Detroit Charter Comm*, 176 Mich 535, 540-541 (1913). The members of

---

[9] Justice VIVIANO is correct that this Court has held that a charter revision commission is not a true legislative body when considering whether a charter commission could legally oust one of its members by exercising the power of a motion. *Eikhoff v Detroit Charter Comm*, 176 Mich 535, 540-541 (1913). But the Court also "conclude[d] that, when elected, they constitute a legally authorized body distinct from and independent of the common council, which is made the sole legislative agency of the municipality." *Id*. at 541. Given the liberal construction rule set forth in Const 1963, art 7, § 34 (the "law concerning counties, townships, cities and villages shall be liberally construed in their favor"), I do not agree with Justice VIVIANO or Justice CLEMENT that a charter

a charter commission are "public officers," and the "framing of a proposed charter . . . is a public function." *Marxer v Saginaw*, 270 Mich 256, 262-263 (1935). The "members of the charter commission act in the place and stead of the people of the city. They exercise a power which might otherwise be performed by the people themselves." *Id*. at 262. The members of the DCRC are thus officers of the city of Detroit who are performing a public function on behalf of the residents of the city. See *id*. at 263. As we have previously recognized, "[t]he power to govern the city and control its affairs is vested in the people through their local municipal officers . . . ." *Veldman v Grand Rapids*, 275 Mich 100, 124 (1936). An overly restrictive distinction between a city and the electorate of a city would undermine the very idea that the people of a city hold the power to frame and adopt the charter that governs a city.[10]

The liberal-construction principle has previously been interpreted as a general framework for assessing all statutes concerning local governance. See *In re Request for Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich 93, 107 (1988). In addition to being applied in challenges to local ordinances, this framework has been applied in reviewing a county executive's decision to lease county owned property, *Univ Med Affiliates, PC v Wayne Co Executive*, 142 Mich App 135 (1985); a county road commission's actions, *Arrowhead Dev Co v Livingston Co Rd Comm*, 413 Mich 505 (1982); a register of deed's actions, *Lapeer Co Abstract & Title Co v Lapeer Co Register of Deeds*, 264 Mich App 167 (2004); a city's selling of grave markers to finance cemetery operations, *Inch Memorials v Pontiac*, 93 Mich App 532 (1979); the actions of a local officer's compensation commission, *Hunt v Ann Arbor*, 77 Mich App 304 (1977); and a county legislative body's actions, *Wayne Co Prosecuting Attorney v Wayne Co Bd of Comm'rs*, 44 Mich App 144 (1972). These cases demonstrate that Article 7, § 34 of the 1963 Constitution has not been limited to the legislative actions of a municipal body, and the fact that the DCRC is not a true legislative body does not preclude its application here.

History therefore shows that Article 7, § 34 has been held applicable not only to assess the legality of direct actions of a municipal entity, but also to assess the legality of the actions of officers and bodies nested within a municipal entity so long as the matter at

---

commission is not a body of the city of Detroit. A charter commission is tasked with creating, amending, or revising a city's charter. This task goes to the very essence of the law of a city.

[10] It is noteworthy that the portion of the Address to the People concerning Article 7, § 21, which Justice CLEMENT refers to, conflated the city with the electorate of the city when discussing the charter adoptions and amendment process: "The purpose is to invest the legislature with power to enact into law such broad general principles relative to organization and administration as are or may be common to all cities and villages, *each city being left to frame, adopt and amend those charter provisions which have reference to its local concerns*." 2 Journal of the Constitutional Convention 1907–1908, p 1571 (emphasis added).

issue is one concerning local governance. This is consistent with the constitutional text, as it imposes the liberal-construction rule on all laws "concerning . . . cities[.]" Const 1963, art 7, § 34. I can think of no principled reason why the liberal-construction rule should not apply to all provisions of the HRCA, because it is the primary law concerning local city governance, or to the authority of the DCRC under MCL 117.22, whose members are public officers of the city of Detroit who are performing a public function for the residents of the city. As already noted, a charter revision commission has many of the hallmarks of a *quasi*-legislative body of a city whose members are public officers elected by city residents and whose expenses are paid from the city's budget. Indeed, the DCRC claims that over $700,000 in expenses have been incurred as a part of the charter revision process—expenses that have or will be paid from Detroit's coffers. A reasonable and liberal interpretation of MCL 117.22 is one that favors the DCRC's ability to present a proposed revised charter to the electorate without the Governor's approval in the absence of clear statutory language to the contrary.

## IV. CONCLUSION

I believe the majority has reached the correct result on the face of the statute alone. However, if there was any doubt about how the silence in MCL 117.22 as to the legal effect of the Governor's lack of approval for a proposed charter revision should be construed, the principles enshrined in Const 1963, art 7, §§ 22 and 34 require the result reached by the majority. While the state Constitution allows the Legislature to impose reasonable limitations on the charter amendment and revision process, I cannot read the silence and ambiguity in MCL 117.22 as providing the Governor such unfettered power to prevent the electorate of a city from ever having an opportunity to vote on a proposed change to their city's charter.[11] Such an interpretation would allow an individual to effectively disenfranchise the political voice and the vote of large portions of the Michigan electorate on matters of local concern, over which the state Constitution guarantees them a right to be heard. See Const 1963, art 7, § 22. Accordingly, I concur in the Court's decision to allow Proposal P to be presented to the residents of Detroit, and should the proposed revised charter be adopted, any concerns with its substance can and should be resolved as needed.

BERNSTEIN, J., joins the statement of WELCH, J.

VIVIANO, J. (*dissenting*).

I respectfully dissent from the majority's decision to allow the Detroit Charter Revision Commission (DCRC) to submit a revised charter to the voters of the city of

---

[11] Should the Legislature disagree with this Court's decision, it of course remains free to revisit the HRCA and enact more specific procedures governing the role of the Governor in reviewing proposed new and revised city charters, such as what has been done for villages and counties. See MCL 78.18; MCL 45.516.

Detroit without the Governor's approval and signature. After examining the text and history of the Home Rule City Act (HRCA), MCL 117.1 *et seq*., and our state Constitution, as well as provisions of similar home rule acts, I would hold that a proposed charter may not be submitted to the electors unless the Governor first approves and signs it. Therefore, I would affirm the judgment of the Court of Appeals that Proposal P is ineligible to be on the ballot for the August 3, 2021 primary election.

## I. FACTS AND PROCEDURAL HISTORY

The current charter for the city of Detroit was adopted in 2012. In the August 2018 primary election, the voters of Detroit voted in favor of a general revision of the 2012 Detroit City Charter, and commissioners to the DCRC were elected in the November 2018 general election.[12]

The DCRC approved a proposed revised charter on February 27, 2021. On March 5, 2021, the DCRC submitted the revised charter to Governor Whitmer, as required by MCL 117.22. Governor Whitmer referred the charter to the Department of the Attorney General for examination. On April 30, 2021, Governor Whitmer returned the charter to the DCRC with her objections and attached the legal review from the Department of the Attorney General, which outlined a number of "substantial and extensive legal deficiencies." Governor Whitmer explained that because of the defects identified by the Department of the Attorney General, she could not approve the proposed revised charter.

On May 6, 2021, the DCRC adopted a resolution to submit Proposal P—which reads, "Shall the City of Detroit Home Rule Charter proposed by the Detroit Charter Revision Commission be adopted?"—to the Detroit City Clerk. On May 10, 2021, the City Clerk expressed her opinion in a letter to the DCRC that the law does not allow a proposed charter revision to be placed on the ballot without the Governor's approval. However, at a meeting on May 11, 2021, the Detroit Election Commission voted 2-1 to place the proposal on the ballot.

---

[12] MCL 117.18 contains a default provision for how a city can revise its charter, but it also allows charters to establish different procedures for revision. The current charter for the city of Detroit establishes its own process, involving the election of commissioners who will work to draft a revised charter. See Detroit Charter, § 9-403 ("The question of whether there shall be a general revision of the City Charter shall be submitted to the voters of the City of Detroit at the gubernatorial primary of 2018, and at every fourth (4th) gubernatorial primary thereafter and may be submitted at other times in the manner provided by law. A primary election shall be held for the offices of Charter Revision Commissioners at the same election and shall be void if the proposition to revise is not adopted. If the proposition to revise is adopted, Charter Revision Commissioners shall be elected at the ensuing general election for governor.").

The DCRC transmitted a revised proposed charter to Governor Whitmer on May 13, 2021. In a letter dated May 24, 2021, Governor Whitmer indicated that she declined to review the changes because the May 11, 2021 deadline for submitting ballot wording to the Detroit City Clerk under MCL 168.646a(2) had passed.

Plaintiffs, two groups of Detroit residents, filed two separate lawsuits against the Detroit City Clerk and the Detroit Election Commission (hereinafter "defendants"), both seeking, *inter alia*, a writ of mandamus. The cases were consolidated, and the DCRC intervened. The trial court granted plaintiffs' petition for mandamus and ordered defendants to remove Proposal P from the August ballot, holding that MCL 117.22 requires a city charter revision to be approved by the Governor before it can be placed on the ballot.

The DCRC appealed to the Court of Appeals and filed a bypass application in this Court. This Court granted the DCRC's motion for a stay, denied the bypass application, and directed the Court of Appeals to expedite consideration of the claim of appeal. *Sheffield v Detroit City Clerk*, ___ Mich ___; 959 NW2d 518 (2021). In a split, published decision, the Court of Appeals affirmed the trial court's removal of Proposal P from the August primary ballot. *Sheffield v Detroit City Clerk*, ___ Mich App ___ (2021) (Docket Nos. 357298 and 357299). The majority "reject[ed] the DCRC's argument that the Michigan Constitution grants it the power to submit a proposed charter revision to the voters regardless of statutory restrictions." *Id*. at ___; slip op at 5. The Court of Appeals majority looked at the language of MCL 117.22 and concluded that the revised charter could not proceed to a vote by the electors without the Governor's approval. *Id*. at ___; slip op at 5-7. Judge FORT HOOD dissented, believing that the DCRC had the authority to place the proposal on the ballot. *Id*. at ___ (FORT HOOD, J., dissenting); slip op at 1. The dissent acknowledged that the city's and the DCRC's authority regarding revisions is subject to the general laws of the state but thought that MCL 117.22 did not constrain the DCRC in the manner that the majority thought it did. *Id*. at ___; slip op at 2. The dissent did not believe that MCL 117.22 requires approval of the Governor as a prerequisite to voters having the opportunity to approve or disapprove a charter revision, noting that the statute "is silent as to the effect and operation of the Governor's failure to approve a charter revision . . . ." *Id*. at ___; slip op at 3.

The DCRC sought leave to appeal in this Court and requested a stay. The Court granted the motion for a stay, *Sheffield v Detroit City Clerk*, ___ Mich ___; 959 NW2d 531 (2021),[13] and subsequently ordered oral argument on the application to consider "(1) whether a proposed revision of a city charter can be submitted to the voters without the Governor's approval of the revision, see MCL 117.22; and (2) the relevance, if any, of the amendment history of MCL 117.22, see, in particular, 1909 PA 279 and 1913 PA 5." *Sheffield v Detroit City Clerk*, ___ Mich ___; 960 NW2d 534 (2021).

---

[13] We later denied plaintiffs' motion for reconsideration of the order granting the stay. *Sheffield v Detroit City Clerk*, ___ Mich ___; 960 NW2d 122 (2021).

## II.  STANDARD OF REVIEW AND INTERPRETIVE PRINCIPLES

"A lower court's decision on whether to grant a writ of mandamus is reviewed for an abuse of discretion.  To the extent that a request for a writ of mandamus involves questions of law, we review them de novo." *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 59 (2018) (citations omitted).  With regard to statutory interpretation, we adhere to the following principles:

> We interpret statutes to discern and give effect to the Legislature's intent, and in doing so we focus on the statute's text.  Undefined terms are presumed to have their ordinary meaning, unless they have acquired a peculiar and appropriate meaning in the law, in which case we accord them that meaning.  The statute must be considered as a whole, reading individual words and phrases in the context of the entire legislative scheme.  Unambiguous statutes are enforced as written.  [*Clam Lake Twp v Dep't of Licensing & Regulatory Affairs*, 500 Mich 362, 373 (2017) (citations and quotation marks omitted).]

We look for the ordinary meaning of the statutory text based on the language used and the reasonable implications arising from that language and the relevant context.  See generally *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 149 (2002) (discussing the meaning of the "plain language" of the applicable statutory text and the reasonable inferences of legislative intent).

## III.  ANALYSIS

## A.  INTERPRETATION OF MCL 117.22

The general framework for adopting and revising municipal charters is established by Const 1963, art 7, § 22, which states:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village.  Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law.  No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section.

This provision grants the electors authority over revisions "[u]nder general laws," such as the one at issue here, MCL 117.22, which is part of the HRCA.  That provision states:

Every amendment to a city charter whether passed pursuant to the provisions of this act or heretofore granted or passed by the state legislature for the government of such city, before its submission to the electors, and every charter before the final adjournment of the commission, shall be transmitted to the governor of the state. If he shall approve it, he shall sign it; if not, he shall return the charter to the commission and the amendment to the legislative body of the city, with his objections thereto, which shall be spread at large on the journal of the body receiving them, and if it be an amendment proposed by the legislative body, such body shall re-consider it, and if 2/3 of the members-elect agree to pass it, it shall be submitted to the electors. If it be an amendment proposed by initiatory petition, it shall be submitted to the electors notwithstanding such objections.

This statute requires that every proposed city charter and every proposed amendment to a city charter "be transmitted to the governor of the state." MCL 117.22.[14] The Governor must then approve and sign it or return it to the relevant entity with objections; amendments proposed by the city's legislative body are returned to that body, while a proposed charter is returned to the charter commission. With regard to an amendment that the Governor returns, if the amendment was proposed by the city's legislative body, the statute provides a means by which that body can override the Governor's rejection by a two-thirds majority so that the amendment can be submitted to the electors. And if the amendment had been proposed by initiatory petition, it must be submitted to the electors notwithstanding the Governor's objections. But the statute does not give a charter commission the power to override the Governor's objections, nor does it provide that its work product must be submitted to the electors notwithstanding the Governor's objections.

The question before the Court is whether the Governor's approval is needed before a revised charter may be submitted to the electors. The DCRC contends that the lack of a provision stating that the revised charter may not be submitted to the electors means that the revised charter must be submitted to the electors despite a lack of gubernatorial approval. Plaintiffs argue that the lack of a provision stating that an unapproved revised charter can still be submitted to the electors means that the revised charter may not be submitted to the electors.

---

[14] The HRCA distinguishes between revising and amending a city charter. Compare MCL 117.18 (establishing the procedures for revising a charter) with MCL 117.21 (establishing the procedures for proposing an amendment to a charter). MCL 117.21(1) provides that an amendment may be proposed either by the legislative body of a city or by an initiatory petition. We have acknowledged the difference between revision and amendment before, in the context of a city's charter. See *Kelly v Laing*, 259 Mich 212, 217 (1932) ("Basically, revision suggests fundamental change, while amendment is a correction of detail.").

## 1. THE GOVERNOR'S APPROVAL

The key language in the statute grants the Governor a veto over amendments and revisions: "If he shall approve it, he shall sign it; if not, he shall return the charter . . . with his objections . . . ." MCL 117.22.  This language, which was enacted in 1909, is nearly identical to the language used in the Constitution at that time to describe the Governor's power to veto legislation:

> Every bill passed by the legislature shall be presented to the governor before it becomes a law.  *If he approve, he shall sign it; if not, he shall return it with his objections to the house in which it originated, which shall enter the objections* at large upon its journal and reconsider it.  On such reconsideration, if 2/3 of the members elected agree to pass the bill, it shall be sent with the objections to the other house, by which it shall be reconsidered.  If approved by 2/3 of the members elected to that house, it shall become a law.  [Const 1908, art 5, § 36, as amended (emphasis added).][15]

That the Legislature used language in MCL 117.22 similar to that in Const 1908, art 5, § 36[16] indicates its intent to grant the Governor formal veto power over charter amendments and revisions.  "The veto power is a legislative function, although it is not affirmative and creative, but is strictly negative and destructive."  *Wood v State Admin Bd*, 255 Mich 220, 224 (1931).  The act of returning a bill is not a ceremonial act but rather an unequivocal expression of disapproval by the Governor, after which the bill will not become law *unless* the Legislature takes action to override the veto.  See *id*. at 231-232 ("Return of a bill on veto is not merely a matter of ceremony between executive and legislative branches of the government.  It is an act of the executive, (a) to unequivocally evidence his disapproval of the bill, and thereby (b) to confer jurisdiction on the legislature to make the bill a law in spite of his disapproval.  It was carefully and skilfully designed to obviate uncertainty as to such disapproval and jurisdiction.").  In the same way, returning an amendment or proposed charter is an unequivocal expression of the Governor's disapproval, amounting to a veto.  Thus, a veto, without reconsideration by the legislative body where permitted, puts an end to the document under consideration.[17]

---

[15] Similar language was included in our earlier Constitutions and appears to have been drawn from Article I, § 7 of the United States Constitution.  See Const 1850, art 4, § 14; Const 1835, art 4, § 16.

[16] References to the 1908 Constitution are to that document as amended, not as ratified, unless otherwise specified.

[17] If MCL 117.22 contained a provision allowing a charter commission to override the Governor's veto, returning the proposed charter to the charter commission would give it jurisdiction to override the veto, just as a city's legislative body has jurisdiction to override a veto of a proposed charter amendment.  But because MCL 117.22 contains no provision allowing a charter commission to override a veto of a proposed charter, the

The similarities between the statutory and constitutional vetoes do not end there. Under both MCL 117.22 and the 1908 Constitution, Const 1908, art 5, § 1, the Governor lacked the ability to veto, respectively, either a charter amendment or law proposed via initiatory petition. Compare MCL 117.22 ("If it be an amendment proposed by initiatory petition, it shall be submitted to the electors notwithstanding such objections."), with Const 1908, art 5, § 1 ("No act initiated or adopted by the people, shall be subject to the veto power of the governor . . . ."). The inability of the Governor to veto a law adopted by the people through an initiative continues under the present Constitution. See Const 1963, art 2, § 9 ("No law initiated or adopted by the people shall be subject to the veto power of the governor . . . .").

The conclusion that the Governor is granted veto power under MCL 117.22 also reflects the ordinary meaning of the terms used in both that statute and Const 1908, art 5, § 36. Definitions of "approve" include "[t]o sanction officially; to ratify; confirm; as, to *approve* the decision of a court martial" and "[t]o pass or have a favorable opinion (of), to judge favorably . . . ." *Webster's New International Dictionary* (1930). As used in Const 1908, art 5, § 36, the former definition is clearly the applicable one. By approving a bill, the Governor is not merely expressing her favorable opinion of the bill; rather, she is officially sanctioning the bill, allowing it to become law. The similarities between Const 1908, art 5, § 36 and MCL 117.22 lead to the conclusion that "approve" in MCL 117.22 should be interpreted the same. Thus, a proposed charter is not transmitted to the Governor with the hope that she will merely express a favorable opinion of the charter; rather, it is transmitted with the hope that she will officially sanction it, allowing it to be submitted to the electors.[18] Just as with charters that were created by a special act under

charter commission only has jurisdiction to consider the Governor's objections and submit an amended proposed charter to the Governor if it so chooses.

[18] Justice WELCH believes that the Governor's approval of a revised charter is merely advisory, but she does not dispute that the Governor's approval of an amendment proposed by a legislative body of a city is more than simply advisory. Under such an interpretation of MCL 117.22, then, the word "approve" would have two different meanings. This not only cuts against the principle that the same word means the same thing when used in different places in a statute, see *Robinson v Lansing*, 486 Mich 1, 18 (2010); it creates a situation in which the same word in the same place has a variable meaning.

The Court of Appeals majority agreed with the trial court that the DCRC's "interpretation would make submission of the draft revision to the Governor for approval an 'empty and useless gesture.' " *Sheffield*, ___ Mich App at ___; slip op at 7. To some extent, this is incorrect. Objections from the Governor could be used to make additional revisions to the proposed charter, which the DCRC attempted to do in this case, and the Governor's actions could influence voters' opinions on the proposed charter. But these potential benefits are inconsistent with a proper understanding of the word "approve." Thus, although the DCRC's interpretation would not make submission entirely

the 1850 Constitution, it is understandable why the Governor would continue to have veto power over charter amendments and charter revisions proposed by a city council or a charter commission. Indeed, this was one contemporaneous understanding of why 1909 PA 279, § 22 granted the Governor such veto power. See, e.g., Miller, *Recent Constitutional and Statutory Enactment in Michigan Relative to Cities*, in National Municipal League, *Proceedings of the Cincinnati Conference for Good City Government and the Fifteenth Annual Meeting of the National Municipal League* (Woodruff ed, 1909), p 236 (explaining that the reasons for the veto provision in 1909 PA 279, § 22 "are that such charter provisions are given the weight of state laws; that the jurisdiction of the body passing them, to wit, the electors of a locality, is an inferior jurisdiction; if an attempt to legislate upon general matters is made, and there is no authority to examine and check such attempts before action is finally taken, much confusion and unnecessary trouble would ensue").[19]

---

ceremonial, it is still inconsistent with the statute. Additionally, to the extent that the DCRC argues that the revised charter only needs to be transmitted to the Governor by August 6 and thus can be transmitted and approved or returned with objections *after* the election, this would render submission to the Governor an empty and useless gesture.

Similarly, the DCRC highlights the fact that MCL 117.22 requires charter revisions to be transmitted to the Governor "before the final adjournment of the commission," while an amendment to a charter must be transmitted "before its submission to the electors," as support for its argument that gubernatorial approval is not a prerequisite for a revised charter to be submitted to the electors. But the only reason this difference could matter is if the revision could be submitted to the electors before it is transmitted to the Governor. If so, then the DCRC might be able to contend that the statutory framework indicates the Governor's approval is unnecessary. But this conclusion would significantly undermine the DCRC's contention that the transmission for the Governor's approval has political value that can be used on the campaign trail. If the Governor's view is so symbolically valuable that it must be obtained even though it is merely advisory, then why allow the electorate to vote on the revision before that opinion is offered?

[19] Cf. McBain, *The Law and the Practice of Municipal Home Rule* (New York: Columbia University Press, 1916), p 561 (noting that the absolute veto power over a charter in Oklahoma's constitution "might have been prompted in part by consideration of the fact that a charter framed by a city was in effect a statute, and that since the governor was given a veto over statutes enacted by the legislature it was appropriate that he should likewise be given a veto over statutes enacted by the cites of the state" but concluding that "[i]t is far more probable . . . that the idea in the minds of those who framed the provision was that the chief executive of the state should assist in keeping the charters of cities in harmony with the general laws and policies of the state"). The relevant provision in Oklahoma's constitution is somewhat different from MCL 117.22 in that the Oklahoma governor is required to approve a city charter "if it shall not be in conflict with the Constitution and laws of th[e] State," Okla Const 1907, § XVIII-3(a), while MCL 117.22 does not specify when the Governor must approve a proposed charter.

The Governor's power over charters would not have struck anyone as novel in 1909. Until the new Constitution was adopted the prior year, there were two ways in which a city could be incorporated: (1) the Legislature incorporated a city and created its charter through a special act, see Const 1850, art 15, §§ 1 and 13, or (2) an incorporated village that met certain population requirements could be incorporated as a city under 1895 PA 215.[20] Of course, any special act incorporating a city was subject to the Governor's power to veto legislation. Thus, the Legislature's decision in 1909 PA 278 to allow the Governor a veto of charter amendments and revisions essentially continued the Governor's role in the process.

## 2. THE EFFECT OF THE VETO

Any doubt that the Governor's veto over changes to charters is the same as that over legislation is removed by the provisions in MCL 117.22 concerning overrides of the Governor's veto. That MCL 117.22 contains an override provision for amendments proposed by a legislative body and establishes that an amendment proposed by an initiatory petition is still submitted to the electors notwithstanding the Governor's objections leads to the conclusion that gubernatorial approval is a prerequisite for a revision being submitted to the electors. If possible, words in a statute should not be read in a way that would render them surplusage. *TOMRA of North America, Inc v Dep't of Treasury*, 505 Mich 333, 350 (2020). The last sentence—establishing that an amendment proposed by initiatory petition is still submitted to the electors notwithstanding the

---

[20] See generally 1 Clute, The Law of Modern Municipal Charters and the Organization of Cities on Commission, City Manager and Federal Plans (1920), § 241, pp 394-395 (describing the incorporation process for cities in Michigan prior to 1909). The Legislature's role in crafting city charters changed with the 1908 Constitution. Under Const 1908, art 8, § 20, as ratified, the Legislature was required "to provide by a general law for the incorporation of cities" and villages. Const 1908, art 8, § 21, as ratified, stated:

> Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter, and, through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the constitution and general laws of this state.

As explained in the Address to the People accompanying the 1908 Constitution, these provisions transferred "the powers of legislation [regarding matters of local concern] from the state legislature to the people of the municipalities or their representatives . . . ." 2 Journal of the Constitutional Convention 1907–1908, p 1571; see generally *Citizens Protecting Michigan's Constitution*, 503 Mich at 61 (noting that the Address to the People is a proper, albeit not controlling, source for interpreting the Constitution).

Governor's objections—would be wholly unnecessary if the default action after a rejection by the Governor were to still submit the amendment or revision to the electors. The DCRC's interpretation would render this last sentence surplusage. Relatedly, the fact that the statute provides for overrides with regard to amendments but not revisions is important. Under the canon of *expressio unius est exclusio alterius*, "the expression of one thing suggests the exclusion of all others." *Mich Gun Owners, Inc v Ann Arbor Pub Sch*, 502 Mich 695, 707 (2018). We have, in fact, applied this very reasoning to the powers of charter commissions, holding that powers "specifically conferred [upon commissions] cannot be extended by inference . . . ." *Eikhoff v Detroit Charter Comm*, 176 Mich 535, 540 (1913).

The Legislature expressly established a mechanism for overriding the Governor's veto of a proposed charter amendment. The absence of an express override provision for a revised charter indicates that a charter commission cannot override a veto of a proposed revised charter in the way that a city's legislative body can override a veto of a proposed charter amendment. The history of the statute's text strongly supports this interpretation. In its original form, MCL 117.22 allowed a charter commission to override the Governor's veto of a revised charter. 1909 PA 279, § 22 stated:

> Every amendment to a charter before its submission to the electors, and every charter before the final adjournment of the commission, shall be transmitted to the Governor of the State. If he shall approve it, he shall sign it; if not, he shall return the charter to the commission and the amendment to the legislative body of the city with his objections thereto, which shall be spread at large on the journal of the body receiving them, and it shall reconsider it. On such reconsideration if two-thirds of the members-elect agree to pass it, it shall be submitted to the electors.

This was changed a few years later by 1913 PA 5, when the section was amended to its present form (now found in MCL 117.22).

The majority misunderstands the changes made through 1913 PA 5 and misapprehends the "silence" in MCL 117.22. 1909 PA 5, § 22 contained a 2/3 majority override provision for both charter amendments and revised charters. But the Legislature changed this with 1913 PA 5, removing the override provision for revised charters and adding that an amendment proposed by initiatory petition is still submitted to the electors. "[A] change in statutory language is presumed to reflect either a legislative change in the meaning of the statute itself or a desire to clarify the correct interpretation of the original statute." *Bush v Shabahang*, 484 Mich 156, 167 (2009).[21] The HRCA has always

---

[21] If, as the DCRC contends, the removal of the override provision for revised charters means that the revised charter is simply submitted to the electors without further action, then, as noted above, there likewise would have been no need for the Legislature to expressly state that unapproved amendments proposed by initiatory petition are submitted to the electors. Justice WELCH's only response to this is to point out that the Constitution

expressly granted the Governor veto power over a proposed charter. What 1913 PA 5 changed was not the Governor's veto power but the charter commission's power to override that veto. Contrary to the majority's conclusion, plaintiffs' position is not that the silence vests the Governor with any veto power. Rather, plaintiffs correctly recognize—as did the lower courts—that the silence, i.e., removal of the override provision applicable to revised charters, deprives a charter commission of the power to override the Governor's veto.[22]

## B. OTHER HOME RULE STATUTES IN MICHIGAN

A review of other home rule statutes in Michigan supports the conclusion that a proposed revised city charter may not be submitted to the electors without gubernatorial approval. The DCRC contends that a lack of an override provision for charter cities would make the revision process for cities out of line with the process for charter villages and charter counties. The DCRC is correct on this point, but only because the Legislature used different language in the Home Rule Village Act, MCL 78.1 *et seq*., and the charter counties act, MCL 45.501 *et seq*.[23] In the Home Rule Village Act, the Legislature chose to treat a proposed revised village charter the same as a proposed amendment to a village charter[24]—similar to the Legislature's initial approach for cities with 1909 PA 279. In

---

similarly prevents the Governor from vetoing laws proposed through initiatory petitions. How this insight saves the last sentence from being rendered surplusage under her reading is hard to fathom.

[22] Justice WELCH believes she has perceived a difference between 1909 PA 279 and the present statute: the former, she thinks, required a charter commission to reconsider a revision after the Governor returned it, while the latter does not. And without an obligation to reconsider by the commission, Justice WELCH makes the puzzling leap to conclude that the "Governor's views are rendered effectively advisory." Justice WELCH does not explain why the duty to reconsider is a necessary element of a veto in these circumstances. I can see no reason for her view. There is no affirmative duty to reconsider *precisely* because the Governor's veto is absolute. The commission cannot reconsider the matter and vote to override the Governor; the commission can only reconsider the matter if it wishes to transmit another charter to the Governor. Contrary to Justice WELCH's contention, I do not claim that the commission has any affirmative obligation to transmit a new charter in these circumstances, only that the commission can do so, as it attempted to here. By contrast, the legislative body's reconsideration is meaningful and necessary because the body can override the Governor's veto.

[23] The Legislature employed language nearly identical language to MCL 117.22 in MCL 119.10, part of the Metropolitan District Act, MCL 119.1 *et seq*., adopted in 1929 PA 312.

[24] MCL 78.18 states, in relevant part:

Every charter framed or revised by a charter commission, and every amendment to a village charter, whether passed pursuant to the provisions

the charter counties act, the Legislature chose not to create an override provision; instead, it established a process for resubmitting a revised charter to the Governor for approval after an initial rejection and created a process of judicial review if the Governor rejects a proposed charter a second time.[25] The Governor has a similar role with respect to charter townships. Under the Charter Township Act, MCL 42.1 *et seq.*, the act itself constitutes the charter of any township that incorporates. MCL 42.1(2). The Governor thus had the opportunity to veto the act and continues to have the ability to veto any legislative changes to the act.

Thus, while the HRCA differs from the Home Rule Village Act and the charter counties act in that it gives the Governor absolute veto power over a proposed revised

---

of this act or heretofore granted or passed by the state legislature for the government of a village shall, before its submission to a vote of the electors be presented to the governor of the state. *If he shall approve it, he shall sign it; if not he shall return the charter to the commission, and amendment to the legislative body of the village, with his objections thereto, and any information or recommendations he may see fit to submit, which shall be spread at large on the journal of the body receiving them, and it shall reconsider it. On such reconsideration, if 2/3 of the members agree to pass it, it shall be submitted to the voters.* [Emphasis added.]

[25] MCL 45.516 states, in relevant part:

The charter shall be submitted to the governor for approval within 30 days after its completion. The charter may be approved by the governor upon written recommendation of the attorney general that it conforms to the provisions of the constitution and the statutes of this state. The governor either shall approve or reject the charter within 30 days of its submission. *If the governor rejects the charter, he shall return it to the charter commission together with a copy of his reasons therefor. Upon the return of the unapproved charter, the commission shall reconvene, consider the reasons for rejection, revise the proposed charter and submit the revised charter to the governor within a period of 45 days. Upon resubmission, the governor either shall approve or reject the charter within 30 days of its resubmission. If the governor rejects the charter, he shall notify the commission of his action and his reasons therefor. Upon the second rejection of the charter, the commission, within 30 days, either shall reconvene and revise the charter to comply with the governor's objections or it shall take all steps necessary to obtain a judicial interpretation to determine whether the charter conforms to the provisions of the constitution and statutes of this state.* Upon approval of the charter by the governor or upon a final favorable judicial interpretation, the commission, within 10 days, shall fix the date, by resolution, for the submission of the proposed charter to the electorate for its adoption. [Emphasis added.]

charter, this disparity exists because the Legislature used different language in the Home Rule Village Act and the charter counties act. "When the Legislature uses different words, the words are generally intended to connote different meanings." *2 Crooked Creek, LLC v Cass Co Treasurer*, ___ Mich ___, ___ n 23 (2021) (Docket No. 159856); slip op at 9 n 23 (quotation marks and citation omitted).[26]

## C. RESPONSE TO THE MAJORITY AND CONCURRENCE

The majority and concurrence argue that the text is silent on the effect of the Governor's veto. In light of the language of the statute and its statutory history, however, it cannot seriously be asserted that the question of whether the Governor has unfettered veto power was not contemplated by the Legislature.[27] In any event, as discussed above, the clear implication of the statute's text, when read in its historical context, is that the Governor's veto power concerning charters proposed by a charter commission is absolute.[28]

---

[26] Perhaps one reason the Legislature chose to treat home rule cities differently in this respect is the fact that the state places different duties on and grants different authority to cities than it does to villages and counties. See generally Michigan Legislative Council, *Michigan Manual 2019-2020* (Lansing: Legislative Service Bureau, 2019), p 634 (explaining the differences between cities, villages, and counties in terms of power and duties).

[27] The authors of *Reading Law* describe the proper approach to reconciling statutory silence with implied meaning as follows:

> The omitted-case canon—the principle that what a text does not provide is unprovided—must sometimes be reconciled with the principle that a text does include not only what is express but also what is implicit. . . . It is part of the skill, and honesty, of the good judge to distinguish between filling gaps in the text and determining what the text implies. [Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), pp 96-97.]

[28] The majority's incomplete answer to the question presented in this case shows the hazards of substituting the Court's views for those of the Legislature. What happens to a proposed charter that the Governor rejects? Does it automatically go before the electors? If so, then why does the statute require the charter and the Governor's objections to it to be returned to the commission? And if it is not automatically submitted to the electors, then how does the commission decide whether to have it submitted after the Governor's veto? Is a simple majority vote sufficient, or is a supermajority needed? The answers to these questions are not readily apparent.

Both the DCRC and the majority suggest the interpretation above should be influenced by constitutional considerations.[29] I disagree. Although the home rule power of cities was strengthened in the state's 1963 Constitution,[30] there is no indication that the revisions made in Article 8, § 21 were intended to abrogate the Governor's role in the incorporation process created by the HRCA. The majority seems to think that the changes made with the 1963 Constitution influence the reasonableness of an interpretation of MCL 117.22 that recognizes the Governor's veto power. I fail to see how our 1963 Constitution could possibly have any bearing on the intent of the Legislature nearly half a century earlier. The only impact Const 1963, art 7, § 22 could have on the Governor's veto power created by MCL 117.22 would be to render it unconstitutional, yet the majority does not reach this conclusion or even address whether there is a concern as to the statute's constitutionality. Although it is true that such concerns might lead a court to adopt a reasonable interpretation of the statute that avoids them altogether, that alternative interpretation must be at least a "fairly possible" reading of the text. *In re Certified Question*, 506 Mich 332, 409 (2020) (VIVIANO, J., concurring in part and dissenting in part) (quotation marks and citation omitted). A court cannot rewrite a statute simply to render it constitutionally unchallengeable. See *United States v X-Citement Video, Inc*, 513 US 64, 86 (Scalia, J., dissenting). Under my interpretation above, I cannot see how the majority's reading of the text is "fairly possible," and thus I must conclude that they have impermissibly rewritten the statute.

Moreover, the other constitutional provisions the majority relies on are inapposite. The last sentence of Const 1963, art 7, § 22, relates to the power of cities and villages "to adopt resolutions and ordinances relating to [their] municipal concerns, property and government," not to the power of a charter commission. Article 7, § 34, by its express terms, applies only to "counties, townships, cities and villages," and thus has no

---

[29] The DCRC also argues that MCL 117.22 cannot trump the state Constitution. Const 1963, art 7, § 22 gives the "electors of each city" the "power and authority to frame, adopt and amend its charter," and Const 1963, art 7, § 34 establishes that "[t]he provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor." But it does not appear to me that the DCRC ever adequately raised or developed this argument, either in this Court or below. And in any event, our order scheduling argument on the application specifically limited our consideration of this case to the statutory interpretation issue. The meaning of MCL 117.22 is clear and thus, in my view, any constitutional questions concerning the statute must await a future case.

[30] As explained in the Address to the People, changes made to Const 1963, art 7, § 22, which was previously found in Const 1908, art 8, § 21, "reflect[ed] Michigan's successful experience with home rule," and "[t]he new language [was] a more positive statement of municipal powers, giving home rule cities and villages full power over their own property and government, subject to this constitution and law." 2 Official Record, Constitutional Convention 1961, p 3393; see also *Associated Builders & Contractors v Lansing*, 499 Mich 177, 185-190 (2016) (discussing the changes made by the 1963 Constitution).

applicability to charter commissions.[31]  Both the majority and concurrence argue that under these constitutional provisions, the commission wields all powers not expressly denied.  See *Detroit v Walker*, 445 Mich 682, 690 (1994).  This is, of course, true of the city as a whole.  But even assuming that the commission is part of the city, it cannot be the case that the commission can exercise any power not specifically denied.  No one has suggested, for example, that the commission has the unenumerated power to open a hot dog stand.  Therefore, it is irrelevant that the city itself might be able to undertake actions not expressly prohibited.  And, as noted, we have directly rejected the argument that the charter commission has powers beyond those that are specifically granted.  See *Eikhoff*, 176 Mich at 540-541.  Thus, Const 1963, art 7, §§ 22 and 34 clearly have no bearing on

---

[31] Justice WELCH says that "one would be hard-pressed to conclude that a charter commission is not a *quasi*-legislative body of the city."  But her assertion is hard to reconcile with our caselaw; we had little difficulty determining in *Eikhoff*, 176 Mich at 540-541, that city charter commissions were not legislative bodies:

> This respondent is not a body created by the State Constitution, nor do we find that there is anything in the statute under consideration which makes it a legislative body, and the powers granted making it the sole judge of the qualifications and elections of its members and to fill vacancies do not *per se* make it such.  Our attention has not been called to any legislative acts which it has been given power to perform, nor have we, from an examination of the entire act, found that it contains any such delegation of power.  *None of the acts permitted or required under this law by charter commissions can be construed or defined as legislative acts in the sense in which the word 'legislative' is used when we speak of the three recognized branches of our republican form of government.*  The legislature by this statute created charter commissions as instruments, under its specific terms, to prepare charters for cities to be submitted to the electors, and to become the fundamental law of such municipalities only when accepted by a majority voting thereon.  *Our conclusion, therefore, is that we cannot agree with the main contention of respondent that these charter commissions are legislative bodies.*  [Emphasis added.]

It is true that we labeled the charter commissioners as city officers in *Marxer v Saginaw*, 270 Mich 256 (1935), but our analysis did not equate the commission with the city itself.  Instead, we focused on the fact that the commissioners acted on behalf of the people, not the city as an entity.  Our conclusion was that the commissioners were "public officers" and that the relevant "public" was the city itself since there was no other formal body with which to affiliate the commissioners.  *Id.* at 262-263.  Nothing in the opinion suggested that the commission's duties or powers were legislative in nature or that they were attributable to the city.

the question of whether a charter commission has the power or authority to override the Governor's veto.[32]

## IV. CONCLUSION

A review of the plain meaning of MCL 117.22, its amendment history, and other Michigan home rule statutes leads me to conclude that gubernatorial approval is a prerequisite to a proposed charter being submitted to the electors of a city. Because the Governor did not approve the proposed charter transmitted to her by the DCRC, Proposal P should not have been placed on the ballot, and plaintiffs were entitled to a writ of mandamus compelling the Detroit City Clerk and the Detroit Election Commission to remove it from the ballot for the August 3, 2021 primary election. Because I believe the Court of Appeals correctly resolved this issue, I would affirm its judgment. For these reasons, I respectfully dissent.

ZAHRA, J., joins the statement of VIVIANO, J.

CLEMENT, J. (*dissenting*).

I agree with Justice VIVIANO's analysis of the disputed statutory provisions in this matter. The majority (and Justice WELCH) invoke certain provisions of the Michigan Constitution to overcome Justice VIVIANO's statutory analysis. While I agree with Justice VIVIANO that we should not be reaching constitutional questions in this case, I write separately to explain why, if the Court is going to do so, these sections of the Michigan Constitution do not support the majority's analysis. The majority's order says that "we must read MCL 117.22 against the backdrop of" two sections of the Michigan Constitution, the same two also discussed by Justice WELCH: Const 1963, art 7, §§ 22 and 34. I do not believe the text or history of either of these sections supports the interpretation the majority is putting forward.

I begin with the constitutional text. Section 22 of the Michigan Constitution is the section generally dealing with "home rule" for cities and villages in Michigan. It provides:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and

---

[32] I also agree with Justice CLEMENT's thoughtful opinion explaining why these constitutional provisions do not support the majority's analysis.

villages in this constitution shall limit or restrict the general grant of authority conferred by this section. [Const 1963, art 7, § 22.]

The first sentence of this section says that "*the electors of* each city and village shall have the power and authority to frame, adopt and amend its charter," subject to operating "[u]nder general laws"—here, the Home Rule City Act, MCL 117.1 *et seq*., including MCL 117.22. The second sentence then speaks to the power of the municipal corporations themselves "to adopt resolutions and ordinances relating to [their] municipal concerns, property and government." This establishes a distinction between actions taken by the electors of the municipality (described in the first sentence) and actions of the municipality itself (described in the second). Moreover, while the second sentence of § 22 provides what the third sentence describes as a "general grant of authority" to cities and villages to legislate about local concerns, the first sentence expressly requires electors to act "[u]nder general laws" when framing a charter. I thus disagree with the majority when it says that under § 22 "the electors of cities are vested with control over their cities' charters"—such control is expressly required to comply with the "general laws" regulating the topic, and it is not an open-ended grant of authority like that given to municipalities themselves to legislate. Under our preceding Constitution, we described the power to adopt local legislation as a "distinct and independent legislative power" from the power to frame a charter, *Gallup v Saginaw*, 170 Mich 195, 203 (1912), and nothing in the text of the 1963 Constitution changes that interpretation.

Section 34 is a general rule of construction for laws relating to certain local units of government and provides direction on how to construe local governments' exercise of that "distinct and independent legislative power." It says that "[t]he provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor." Const 1963, art 7, § 34. It directs us to "liberally construe[]" laws concerning specified municipalities—including the municipalities that are mentioned in § 22 *in contradistinction to* the electors who live within those municipalities. Justice WELCH asserts that "one would be hard-pressed to conclude that a charter commission is not a *quasi*-legislative body of the city," but the constitutional text does not bear that out—it treats the charter-drafting process as an action of the *electors* of the city, not an action of the city *itself*. "[T]he legislative body of each municipality is its aldermen or common council," whereas charter commissions are "instruments . . . to prepare charters for cities to be submitted to the electors . . . ." *Eikhoff v Detroit Charter Comm*, 176 Mich 535, 540, 541 (1913). And this is only logical—the charter is the organic document *of* the city, meaning that actions the city itself takes can only be performed *under* a charter, which is distinct from the process of drafting the charter in the first instance (or, as here, performing the equivalent action of proposing a new charter for an existing city). As we have said, "[w]e are unable to conceive of a valid municipal corporation without a charter, or a municipal charter without a corporation[.]" *Gallup*, 170 Mich at 201. Section 34 and the second sentence of § 22, by their terms, apply to actions of municipalities acting under a charter; the charter-framing process is distinct as a matter of the text and "the fundamental principles of law applicable to municipal corporations . . . ." *Id*. I agree with Justice WELCH that § 34 "has been held applicable

not only to assess the legality of direct actions of a municipal entity, but also to assess the legality of the actions of officers and bodies nested within a municipal entity," but the critical point is that a charter revision commission is not "nested within a municipal entity"—it is, rather, an act of the electors as to the organic document that precedes the existence of the municipal entity.[33]

The history of these constitutional provisions further supports this reading of the text. As Justice WELCH notes, home rule originated in the Constitution of 1908. Prior to the Constitution of 1908, any community that wanted a corporate existence as a city or village needed to convince the Legislature to pass a statute that would create the municipal corporation and function as its organic law—its charter. We have described the shortcomings of this system in the past:

> Considering the history of legislation under the Constitution of 1850, it is apparent that there had grown up a pernicious practice on the part of the legislature in passing local acts. The practice was bad in two very important particulars. In the first place, much of the legislation thus enacted constituted a direct and unwarranted interference in purely local affairs and an invasion of the principles of local self-government. In the second place, such legislation affecting as it did certain limited localities in the State, the senators and representatives from unaffected districts were usually complaisant, and agreed to its enactment without the exercise of that intelligence and judgment which all legislation is entitled to receive from all the members of the legislature. This course led to many abuses (principally in amendments to city charters) . . . . [*Attorney General ex rel Dingeman v Lacy*, 180 Mich 329, 337-338 (1914).]

This frustration manifested itself both as communities that wanted to incorporate or wanted changes to their terms of incorporation but could not convince the Legislature to cooperate, and also as communities that were compelled to change their terms of incorporation involuntarily by the Legislature:

> Changes in city charters and in the organization of their several departments were frequently made by the legislature, and public sentiment became antagonistic to such interference which, it was felt in many cases, was unwarranted, and this opposition to legislative interference with matters of

---

[33] This theory is central to how our federal government came to exist. Under the Articles of Confederation, amendments required unanimous consent of all state legislatures, see Articles of Confederation, art XIII, but our substantially different current Constitution came into effect on the ratification of only nine states, see US Const, art VII, on the theory that the act of framing a new constitution altogether was an act of the People themselves and thus was not an action taken *under* the Articles of Confederation.

purely local concern led to the constitutional provisions[.]    [*Marxer v Saginaw*, 270 Mich 256, 259 (1935).]

The Constitution of 1908 thus required that the Legislature "provide by a general law for the incorporation of cities, and by a general law for the incorporation of villages . . . ." Const 1908, art 8, § 20.

"[I]n obedience to [this] mandate," *Gallup*, 170 Mich at 199, the Legislature passed such a "general law" for cities: the Home Rule City Act, 1909 PA 279.  The Constitution also contained some requirements for this "general law."  Most relevant was the predecessor to our current § 22, which provided in terms almost identical to our current Constitution:

> Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or passed by the legislature for the government of the city or village and, through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the constitution and general laws of this state.  [Const 1908, art 8, § 21.]

Both the Address to the People and our caselaw indicate that the problem these constitutional provisions were responding to was the involvement of the Legislature.  As the Address said:

> These provisions constitute a marked advance from the present constitutional provisions relating to cities and villages by doing away with . . . special charters, granted and subject to amendment only by the state legislature.  The purpose is to invest the legislature with power to enact into law such broad general principles relative to organization and administration as are or may be common to all cities and all villages, each city being left to frame, adopt and amend those charter provisions which have reference to its local concerns.  The most prominent reasons offered for this change are that each municipality is the best judge of its local needs and the best able to provide for its local necessities; that inasmuch as special charters and their amendments are now of local origin, *the state legislature will become much more efficient and its terms much shorter if the labor of passing upon the great mass of detail incident to municipal affairs is taken from that body and given into the hands of the people primarily interested.*  [2 Journal of the Constitutional Convention 1907–1908, p 1571.]

Such a change would "secure for all general legislation grave attention and the application of the collective wisdom of the legislators." *Dingeman*, 180 Mich at 338.  If the point of this home rule process was to reduce the *Legislature's* involvement to

making a "general grant of rights and powers," *Gallup*, 170 Mich at 200, there is no particular reason to question the *Governor's* involvement in supervising and potentially vetoing proposed charters.

It is not a coincidence that the home rule language in our current Constitution is almost identical to that of its predecessor. The Constitutional Convention expressly rejected a proposal that would have broadened the language in a fashion more consonant with what the Court says the current text means. The proposal of the Committee on Local Government that became § 22 originally provided:

> The electors of each city and village are hereby granted the power and authority to frame, adopt, amend and revise its charter, and to amend and revise an existing charter of the city or village heretofore granted or passed by the legislature for the government of the city or village. The legislature shall provide by general law the procedure for framing, adopting, amending, and revising such charters. [1 Official Record, Constitutional Convention 1961, p 1005 (formatting altered).]

When this language came to the floor, Delegate Thomas Sharpe moved to revise this language to conform to the prior constitutional language. *Id*. at 1021. Delegate J. Edward Hutchinson spoke out against the committee proposal in terms that are relevant to our concerns.

> [T]here is some concern around convention hall that although the committee assures us it intended no substantive change by this language, that a substantive change has been effected by it.
>
> Under the old statute, under the old provision, it is clearly stated that "under general laws" the electors could do thus and so, the electors of a city or village. The new language strikes out this reference to "under general laws" and, apparently, vests in them some kind of an inherent and independent power. I state that there is considerable concern in some part of the convention that you have accomplished a substantive change. [*Id*.]

What is notable about this debate is its attachment to the then-existing status quo. The committee members argued that the proposed language still gave the Legislature the power to pass a law establishing procedures to follow, but Hutchinson was not satisfied:

> The language that [Delegate Don] Seyferth reads says that "The legislature shall have the power . . . " to do what? Merely to provide the procedures of what goes into those charters; whereas the old language and the present home rule acts not only provide the procedures, but they also provide such things as this: "every city charter shall provide," and "every city charter may provide" other things.

In other words, under the present home rule system, within the framework of a general law, the state as a whole, if you please, the legislature, acting for the state as a whole, can, in a sense, define what must go into a charter and what may go into a charter. Now you are wiping all that out and simply saying the legislature has the power to provide the procedures whereby the people may revise and amend their charters.

Very obviously, you are taking away from the state any control over the substance of those charters, and I think that is a substantive change. [*Id*.]

Hutchinson also made the commonsense inference we draw when phrasing is changed:

[W]hen you change language, the obvious first attempt always is to find out what difference in meaning there is, and, obviously, at least to me, I would say that this change in language had accomplished a substantive change which I pointed out, and for that reason I am supporting Mr. Sharpe's amendment, which would reinsert the present language. [*Id*. at 1023.]

The amendment to revert to the language from the prior constitution was adopted. *Id*.

This strident defense of the status quo under the Home Rule City Act is, in my view, exceedingly difficult to reconcile with the majority's assertion that the Constitution of 1963 should affect how we read MCL 117.22. The convention expressly rejected language that would have expressed the ability to frame a charter in terms of being an affirmative right of the electors, and instead endorsed maintaining the status quo. Granted, the discussion was not focused on the question of gubernatorial review of proposals, but the convention expressly preferred language that maintained the status quo and subordinated the ability to frame a charter to the "general laws" adopted by the Legislature. This is a curious way to express dissatisfaction with the Home Rule City Act.

On its own, then, I believe we should construe § 34 in light of the convention's treatment of § 22. If the convention preferred to expressly preserve the status quo as to local framing of charters under § 22, it is a suspect interpretation of § 34 that the convention would turn around and undermine the decision it had just made. But the discussion of § 34 also indicates that it is not applicable to this situation. The committee proposal said that "[t]he provisions of this constitution and the laws of this state concerning municipal corporations shall be liberally construed in their favor." *Id*. at 1048 (formatting altered). This indicates that what the convention had in mind when dealing with § 34 was actions taken by these *municipal corporations*. By this I mean that what was contemplated was actions taken *under* their municipal charters.

Examples from the convention debate illustrate this principle. The representative of the Committee on Local Government explained that the language "was taken from the

New Jersey constitution" and was attractive to them because "New Jersey has a reputation in the United States for being one of the front runners in modern zoning and planning decisions out of their courts" given that New Jersey had held that "substantially the same language . . . sustain[ed] the township and city zoning ordinances or village zoning ordinances." *Id.* Zoning ordinances are, of course, actions taken by the municipal corporation under its charter. The committee representative also said:

> Any statute that is on its face or in its purpose in derogation of the common law, comes under a rule of construction which says it must be strictly construed. Every "t" has to be crossed and every "i" has to be dotted. There is another whole area of powers that are involved in this, and that is any statute conferring a police power, such as the power to adopt a zoning ordinance, a building code, a plumbing code, a heating code, electrical codes—these are all exercises of the police power, and any ordinance conferring this kind of a power is subject to the statutory construction or strict construction. [*Id.* at 1050.]

Again, an exercise of the police power is an action of the municipality under its charter. Other delegates offered examples:

> Let me just give you an illustration. Every session of the legislature we have 12 to 15 bills just putting in some little detail that somebody forgot before, but that the township can't do unless you can open the books and find the place that says you can do it. We have no township roads any more, but a few years ago the legislature felt that the township still ought to be able to build a sidewalk, even though they are not township roads. So they passed an act saying the township could build sidewalks. The first winter they found that the snow fell on the sidewalks the same as on the city sidewalks. So they had to come back and get a legislative act authorizing the township to take the snow off the sidewalks. The next year they found that a kid might get run over in a township just the same as in the city. So they had to come back and expressly get authority from the legislature for the township to build that sidewalk up over the road; an overpass, in other words. You wouldn't get that kind of foolishness in connection with the cities. You do get it in connection with townships. It is a serious handicap.
>
> That same thing is true in the counties. The question came up the other day: suppose we fix millage for the counties so they would have more than they really needed in money; could they turn it over to the schools? No. Why? Not because it wouldn't be proper procedure but because the legislature hasn't said in just so many words you can do it. [*Id.* at 1052.]

These examples—building and maintaining sidewalks, handling money—are, again, actions taken by the incorporated entity itself, not the electors who live within its

boundaries. The proposed language was eventually approved. The use of the convention's approval of a liberal construction for "municipal corporations" and the terms of the debate on what became § 34 are consistent with the convention's handling of § 22: broadening the constitutional statement of a municipal corporation's authority to *legislate* even while maintaining the status quo as to *charter framing*.

Of course, the language ratified by the voters as § 34 differed from the language discussed on the floor, but the change further confirms that the convention did not intend to broaden § 34's applicability to a body such as a charter commission. The floor proposal referred to a liberal construction for laws "concerning municipal corporations," while the ratified language refers to laws "concerning counties, townships, cities and villages." This change occurred in the work performed by the Committee on Style and Drafting. One delegate asked whether the original "municipal corporations" language "should possibly be applied to, say, metropolitan authorities in the future?" 2 Official Record 1961, p 2537. The representative of the Committee on Style and Drafting responded:

> [A]fter considerable research in style and drafting we discovered that the words "municipal corporations" in Michigan, especially, and across the country in general, had no definitive meaning. Therefore, you will find consistently that style and drafting has taken out the words "municipal corporations" and inserted the specific subdivisions to which we thought they made reference. In this particular provision, the issue was to give "cities, villages, counties and townships" liberal construction and this is where we left it because the term "municipal corporations" under Michigan law and most state law is not definitive. [*Id.*]

Note that the discussion related to the *subdivisions* (of government) implicated—a reference to their acts in their municipal capacity rather than the electors of the municipality. There is nothing indicating it broadened applicability of the section beyond the municipalities as corporate entities to extend to lawmaking actions of the electors within the municipalities—which is, again, further confirmed by the fact that the convention rejected phrasing the ability of electors to frame a city charter under § 22 as an affirmative right.

Another aspect of § 34 that is important to emphasize is that it is only a rule of construction; it does not confer any independent authority on cities. This is, of course, made clear by its text, which says that legal authorities as to cities "shall be liberally construed in their favor." This was also made clear at the convention, where the committee representative said that it was "the intention, the clear cut intention of the committee that this section, in and of itself shall grant no powers[.]" 1 Official Record 1961, p 1049. Rather, § 34 "is merely a rule of construction to guide the court in construing either statutes or provisions of this constitution when a question comes up as to whether or not a municipality can do a certain thing." *Id.* To the extent that the majority construes the statute as *silent*, then, the constitutional provision cannot breathe

life into that silence and imply a power not conferred—such as a power to submit a charter to the electorate in the face of gubernatorial disapproval. We established this principle in *Delta Charter Twp v Dinolfo*, 419 Mich 253 (1984). There, the question was whether the township "had the power to define a family" under a prior zoning system. *Id*. at 260. We noted that "[i]n the absence of state enabling legislation, a political subdivision has no power to zone," but "[o]nce the power has been granted to a political subdivision, . . . it should not be artificially limited." *Id*. at 260 n 2. If the argument here is that the Home Rule City Act is legitimately *silent*, then *Dinolfo* seems to stand for the proposition that § 34 cannot be used to confer a power on the city that the statute does not provide. The more apt application of § 34 is as a repudiation of cases such as our decision in *Attorney General ex rel Lennane v Detroit*, 225 Mich 631 (1923). There, the Home Rule City Act authorized cities to perform " 'any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants,' " *id*. at 638, quoting 1909 PA 279, § 4(t), as amended by 1911 PA 203, which the city had drawn upon to adopt certain minimum wage and maximum hours requirements. Notwithstanding the grant of authority in the Home Rule City Act, we struck the local regulation down as an "exercise [of] the police power not only over matters of municipal concern, but also over matters of state concern[.]" *Id*. at 641. We recently overruled *Lennane* in *Associated Builders & Contractors v City of Lansing*, 499 Mich 177 (2016), and in doing so questioned whether it had ever been rightly decided but in any event said it was no longer viable in light of § 34 (as well as § 22). Section 34 applies to situations like that in *Lennane*, in which this Court insisted on an unwarrantedly crabbed interpretation of a power *affirmatively granted to the city*; it does not empower us to turn what is "silence" into authority.

In closing, consider a counterfactual hypothetical. Imagine if, some years ago, an attorney in the city's corporation counsel's office had been working through what might happen if the voters convened a charter commission. In reviewing the Home Rule City Act, this staff attorney worked through the procedures it requires and, reaching MCL 117.22, noticed that it does not expressly provide for what happens if the Governor disapproves of a proposed charter. Our hypothetical staff attorney predicts, on the basis of the statutory language, that a court would likely hold that gubernatorial disapproval of a proposed charter would prevent its submission to the voters, but the statute admittedly does not say that in express terms. So, she suggests that the city council adopt an ordinance filling this gap by making explicit what the dissent today believes is implicit. The city council agrees, and adopts an ordinance that expressly states that it is the duty of the city clerk not to submit a proposed charter to the electors if it has been disapproved by the Governor. Such an ordinance would, seemingly, "relat[e] to [the city's] municipal concerns . . . and government," which the city may regulate under § 22—the conduct of elections by city officials being a core "municipal concern." Had this happened, and the events surrounding this charter revision otherwise spooled out as they have, on what basis could the Court decide, under its reasoning today, how to choose between the ordinance adopted by the city council directing that the charter *not* be submitted, and the resolution

adopted by the charter commission that the charter *be* submitted? What would it mean to construe the law "liberally . . . in [the city's] favor"? The majority's rationale provides no apparent answer that I can see, which introduces a conundrum into our jurisprudence on this topic that did not exist before and that I therefore believe is indicative of the weaknesses of the gloss the majority is placing on these constitutional provisions.

As I noted at the outset, I agree with Justice VIVIANO's analysis of the statutory text. On that basis alone, I would conclude that this matter should not be submitted to the voters and that this Court should not entertain constitutional arguments to the contrary. Even if the Court *is* to entertain constitutional arguments, however, I do not believe the majority makes a persuasive case for its reading of §§ 22 and 34.

ZAHRA, J., joins the statement of CLEMENT, J.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

July 29, 2021



t0725

Clerk